## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| TINNUS ENTERPRISES, LLC, ZURU LTD., ZURU INC., ZURU UK LTD., ZURU LLC, ZURU PTY LTD., | § § § | CIVIL ACTION NO.  6:17-CV-00170-RWS |
| | § § | |
| **Plaintiffs,** | § § | |
| | § | |
| **v.** | § § | |
| | § | |
| TELEBRANDS      CORPORATION, BULBHEAD.COM, LLC,  BED BATH & BEYOND INC., | § | |
| | | |
| **Defendants.** | | |

### REDACTED REPORT AND RECOMMENDATION OF
### UNITED STATES MAGISTRATE JUDGE

Before the Court is Defendants Telebrands Corporation ("Telebrands") and Bulbhead.com, LLC (collectively "Defendants") Motion to Dismiss for improper venue pursuant to Fed.R.Civ.P. 12(b)(3) and for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). (Doc. No. 156.) Plaintiffs Tinnus Enterprises LLC and ZURU Ltd. (collectively "Plaintiffs") filed a response. (Doc. No. 163.) Defendants filed a reply (Doc. No. 167) and Plaintiffs filed a sur-reply (Doc. No. 174). In addition, supplemental briefs were filed upon further discovery. (Doc. Nos. 222, 233.) For the reasons stated herein, the Court **RECOMMENDS** that Defendants' Motion (Doc. No. 156) be **DENIED**.

Also before the Court is Plaintiffs' related Motion to strike Defendants' venue expert (Doc. No. 220), to which Defendants filed a response (Doc. No. 230), Plaintiffs filed a reply (Doc. No. 241), and Defendants filed a sur-reply (Doc. No. 251), as well as Defendants' Motion to strike Plaintiffs' exhibits, Doc. Nos. 222-1 and 222-2, (Doc. No. 231), to which Plaintiffs filed

a response (Doc. No. 247).   Because the Court did not rely on the evidence subject to the Motions to strike in reaching its recommendation, those Motions (Doc. Nos. 220 and 231) are **DENIED** as moot.

## BACKGROUND

Plaintiffs filed their first suit in this Court on June 9, 2015, alleging that Telebrands's Balloon Bonanza product infringes U.S. Patent No. 9,051,066 ("the '066 Patent").   (Case No. 6:15-cv-551, Doc. No. 1.)   Plaintiffs filed a motion for a preliminary injunction in that action against Telebrands's Balloon Bonanza products.   (Case No. 6:15-cv-551, Doc. No. 9.)   This Court held a hearing on that motion and ultimately granted a preliminary injunction, enjoining the sale of Telebrands's Balloon Bonanza products.   (Case No. 6:15-cv-551, Doc. Nos. 66, 84, 91.)  On January 24, 2017, the Federal Circuit affirmed the Court's injunction on the '066 Patent. *See Tinnus Enterprises, LLC v. Telebrands Corp.*, 846 F.3d 1190, 1202 (Fed. Cir. 2017).   That case has since been stayed pending a subsequent appeal of the Patent Trial and Appeal Board's ("PTAB") final written decision to the Federal Circuit.  (Case No. 6:15-cv-551, Doc. No. 308.)

At some point during the pendency and decision on the preliminary injunction as to the Balloon Bonanza products, Telebrands redesigned and developed its similar "Battle Balloons" product.  Plaintiffs filed an emergency motion for contempt of court against Telebrands to enjoin the sale of the Battle Balloons products and for monetary sanctions as to the '066 Patent.  (Case No. 6:15-cv-551, Doc. No. 113.)  On February 19, 2016, the Court held a hearing on contempt, soliciting testimony from both side's experts regarding the technical aspects of the redesigned products, and ultimately denied contempt.  (Case No. 6:15-cv-551, Doc. Nos. 144, 166.)

On January 26, 2016, Plaintiffs filed a related action against Telebrands, alleging Telebrands's Battle Balloons infringe U.S. Patent No. 9,242,749 ("the '749 Patent"), U.S. Patent

2

No. 9,315,282 ("the '282 Patent").   (Case No. 6:16-cv-33, Doc. Nos. 1, 3.)   On that same day, Plaintiffs also filed a related suit against Retailer[1] defendants for infringement of the '066, '282, and '749 Patents.[2]   (Case No. 6:16-cv-34.)   Plaintiffs then filed an emergency motion for a preliminary injunction in both cases as to the Battle Balloons products for alleged infringement of the '749 and '282 Patents.   (Case No. 6:16-cv-33, Doc. No. 19; Case No. 6:16-cv-34, Doc. No. 26.)   The Court consolidated both actions, and on October 31, 2016, an injunction issued against Defendant Telebrands in the lead action.   (Case No. 6:16-cv-33, Doc. No. 159.)   The Retailers did not agree to be bound by the injunction against Telebrands and the Court therefore separately considered whether an injunction should issue against the Retailers.   The Court held a hearing on November 21, 2016, and ultimately granted an injunction against the Retailers.   (Case No. 6:16-cv-33, Doc. Nos. 182, 211, 224.) The Federal Circuit recently affirmed the injunctions against Telebrands and the Retailers. *Tinnus Enterprises, LLC et al. v. Telebrands Corp. et al*, Nos. 2017-1175, 2017-1760, 2017-1811 (Fed. Cir. Jan. 16, 2018).   On November 14, 2017, this Court tried both of these actions to a jury verdict. Trial proceedings were held over the course of seven days and on November 21, 2017, the jury returned a verdict finding that Telebrands infringed the '749 and '282[3] Patents, that the '749 and '282 Patents were valid, and that infringement was willful. (Case No. 6:16-cv-33, Doc. No. 544.) Post-trial proceedings for those actions are currently ongoing.

During the pendency of Case No. 6:16-cv-33, Plaintiffs learned of Telebrands's development of their newest water balloon product, Easy Einstein Balloons.   On January 23,

---

[1] Retailer Defendants are: Bed Bath & Beyond Inc, Fry's Electronics, Kohl's Department Stores Inc, Sears Holding Corporation, The Kroger Company, Toys "R" Us-Delaware, Inc., Wal-Mart Stores Inc., and Walgreens Boots Alliance, Inc. (collectively the "Retailers").
[2] The claims regarding the '066 Patent as to the Retailers have since been severed and stayed at the request of the parties pending the appeal of the PTAB's final written decision.  Case No. 6:16-cv-33, Docket No. 256.
[3] Telebrands stipulated to infringement of the '282 Patent.

2017, Plaintiffs filed a motion to compel samples, documents, and information related to the Easy Einstein Balloons.  (Case No. 6:16-cv-33, Doc. No. 219.)  Telebrands opposed this motion, asserting that the products were not relevant because they were not accused of infringement and not yet publicly available.  (Case No. 6:16-cv-33, Doc. No. 221.)  The Court found that these products were relevant to the Court's injunctions and ordered the requested information produced pursuant to the Court's Protective Order.   (Case No. 6:16-cv-33, Doc. No. 223.)  Thereafter, on March 20, 2017, Plaintiffs filed the instant action alleging that Telebrands's Easy Einstein Balloons infringe the '749 Patent, the '282 Patent, U.S. Patent No. 9,527,612 ("the '612 Patent"), and U.S. Patent No. 9,533,779 ("the '779 Patent").  (Doc. No. 1.)  At that time, Telebrands's Easy Einstein Balloons were already on the market and Plaintiffs moved for an *ex parte* temporary restraining order ("TRO") and preliminary injunction.  (Doc. No. 5.)

On March 28, 2017, the Court held a contested evidentiary hearing on the TRO and preliminary injunction in this action.  The Court denied Plaintiffs' application for a TRO, but set the preliminary injunction on an expedited briefing schedule and set an additional evidentiary hearing.  (Doc. No. 28.)  Plaintiffs filed a motion for preliminary injunction on April 3, 2017 (Doc. No. 41), and the Court held a second contested evidentiary hearing on April 12, 2017. The Court granted the preliminary injunction on May 19, 2017. (Doc. No. 89.) The Federal Circuit has since affirmed that injunction. *Tinnus Enterprises, LLC et al. v. Telebrands Corp. et al*, No. 2017-2194 (Fed. Cir. Jan. 16, 2018).[4] Although venue was not affirmatively contested during the injunction proceedings in this matter, Defendants filed a motion to dismiss for improper venue as to Plaintiffs' amended complaint (Doc. No. 74) on May 26, 2017. (Doc. No. 90.) Plaintiffs filed

---

[4] Also raised on appeal was whether the Court erred in failing to stay the entry of the injunction, which had already been granted, prior to deciding the issue of whether venue was proper. The Court's decision was affirmed in its entirety without written opinion. *Tinnus Enterprises, LLC et al. v. Telebrands Corp. et al*, No. 2017-2194 (Fed. Cir. Jan. 16, 2018).

a response requesting venue discovery. (Doc. No. 114.) On June 21, 2017, The Court granted Plaintiffs 30 days for completion of venue related discovery. (Doc. No. 128.) Thereafter, the Court granted several *joint* motions for extension of time to complete discovery. (Doc. Nos. 142, 147, 152.)  During this time, Plaintiffs also moved to modify the Court's injunction. (Doc. No. 135.) The motion was fully briefed, and the Court ultimately held a hearing on that motion on October 25, 2017. (Doc. No. 190.)

On September 18, 2017, Defendants filed this renewed motion to dismiss. (Doc. No. 156.) In view of incomplete discovery and recent case law, Plaintiffs asked again for further venue discovery. (Doc. No. 163.) Plaintiffs also filed a motion to strike Defendants' venue expert or to alternatively re-open discovery. (Doc. No. 175.) The Court granted the motion for further discovery, stayed the case to complete the venue determination, and requested supplemental briefing. (Doc. No. 208.) The parties again jointly asked for an extension to complete venue discovery and the Court granted that extension. (Doc. No. 213.) Thereafter, the supplemental briefs were filed and Defendants' Motion became ripe for review. (Doc. Nos. 222, 233.) At the time Defendants filed their supplemental brief, they also filed a motion to strike two of Plaintiffs' exhibits in support of Plaintiffs' supplemental brief. (Doc. No. 231.)

## LEGAL STANDARD

### I.    Fed.R.Civ. P. 12(b)(3)

Federal Rule of Civil Procedure 12(b)(3) provides a mechanism for dismissal where venue is improper in the district where the case is brought. Fed.R.Civ.P. 12(b)(3). In a case involving alleged patent infringement, venue is proper: (1) in the district in which the defendant resides; or (2) in a district where the defendant has committed acts of infringement and has a regular and established place of business. 28 U.S.C. § 1400(b).  "[A] domestic corporation

'resides' only in its State of incorporation for purposes of the venue statute." *TC Heartland LLC v. Kraft Foods Grp. Brands LLC,* 137 S.Ct. 1514, 1517 (2017).  With respect to whether a defendant has a regular and established place of business, courts seek to discern "whether the corporate defendant does its business in that district through a permanent and continuous presence." *In re Cordis Corp.*, 769 F.2d 733, 737 (Fed. Cir. 1985).  Recently, the Federal Circuit revisited *Cordis* and § 1400(b) and found that three requirements must exist for venue to be proper: (1) there must be a physical place in the district; (2) it must be a regular and established place of business; and (3) it must be the place of the defendant. *In re Cray Inc.,* 871 F.3d 1355, 1360 (Fed. Cir. 2017).

## II.    Fed.R.Civ.P. 12(b)(6)

In considering a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), "[t]he central issue is whether, in the light most favorable to the plaintiff, the complaint states a valid claim for relief." *McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1356 (Fed. Cir. 2007) (internal quotations omitted); *Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239, 243 (5th Cir. 2010).  A plaintiff's complaint survives a defendant's Rule 12(b)(6) motion to dismiss if a plaintiff has pleaded "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "'[D]etailed factual allegations'" are not required.  *Iqbal,* 556 U.S. 662 at 678 (quoting *Twombly*, 550 U.S. at 555).  Nevertheless, a complaint must allege "sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  This determination is a "context-

specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950.

## DISCUSSION

### I.   Claims for Patent Infringement

Plaintiffs allege Defendants infringe U.S. Patent Nos. 9,242,749 ("the '749 Patent"), 9,315,282 ("the '282 Patent"), 9,527,612 ("the '612 Patent"), and 9,533,779 ("the '779 Patent") (collectively "the patents-in-suit") in their amended complaint. (Doc. No. 74.) As to the patent infringement claims, Defendants argue that they timely contested venue in this matter and that neither Defendant resides in this District such that the claims should be dismissed for improper venue pursuant to Federal Rule of Civil Procedure 12(b)(3). (Doc. No. 156, at 9–13.) Plaintiffs argue that Defendants have forfeited the ability to contest venue through their conduct in this action and the related actions proceeding before this Court. (Doc. No. 163, at 9–11, Doc. No. 222, at 10–12.) Plaintiffs further argue that venue is proper in this District under the second prong of §1400(b). *Id.* at 17–21; 12–16.

#### a.   Residence under §1400(b)

As discussed above, the Federal Circuit has recently held that for venue to be proper in a given district: (1) there must be a physical place in the district; (2) it must be a regular and established place of business; and (3) it must be the place of the defendant. *In re Cray,* 871 F.3d at 1360.  "In deciding whether a defendant has a regular and established place of business in a district, no precise rule has been laid down and each case depends on its own facts." *Id.* at 1362. In applying the three-part test set forth above, the Federal Circuit noted that with respect to the first factor, "place" need not be a "fixed physical presence in the sense of a formal office or store," but there must still be "a physical, geographical location in the district from which the

business of the defendant is carried out." *Id.* With regard to the place of business being "regular and established" the Federal Circuit stated that a business may be "regular" if it operates in a steady, uniform, orderly, and methodical manner, and "established" if it is not transient but instead settled certainly or fixed permanently. *Id.* at 1362–63 (internal quotations omitted). Finally, in requiring that the place of regular and established business must be the "place of the defendant," the Federal Circuit explained that "the defendant must establish or ratify the place of business," and that relevant considerations include "whether the defendant owns or leases the place, or exercises other attributes of possession or control over the place." *Id.* at 1363. Further, a "defendant's representations that it has a place of business in the district are relevant to the inquiry" where the defendant "actually engage[s] in business from that location." *Id.* at 1363–64. "A further consideration for this requirement might be the nature and activity of the alleged place of business of the defendant in the district in comparison with that of other places of business of the defendant in other venues." *Id.* at 1964.

As an initial matter, no one disputes that Defendants are alleged to have committed acts of infringement in this District through the sale of the alleged infringing products throughout this District. The only dispute is whether Defendants also have a regular and established place of business in this District. Defendants argue that neither its holiday tables, As Seen on TV product sections, nor its product pallet displays in this District constitute a regular and established place of business in this District. (Doc. No. 233, at 15–17.) Defendants argue that the retailers they sell goods to control the stocking, display, and sale of their products. *Id.* at 17–19. Plaintiffs argue that venue is proper in this District because the first two prongs under *Cray* are not in dispute, and the third prong is met because Telebrands leases space in stores in this District and exercises control of its product pallet placement in this District. (Doc. No. 222, at 13–16.)

### i.  Physical Place in this District

In their motion to dismiss, Defendants did not dispute this factor. (Doc. No. 156, at 11–13.)  The Court finds this factor is satisfied because there are admittedly numerous physical locations in this District where Defendants carry out their business, including the sale of the alleged infringing products. *See In re Cray,* 871 F.3d at 1360 (finding that a "place" must include "a physical, geographical location in the district from which the business of the defendant is carried out."); *see also* Doc. No. 222-4, Telebrands's First Supplemental Reponses to Plaintiffs' First Set of RFAs, at 7 (admitting to conducting business at Wal-Mart and other retail locations in this District). Moreover, as will be discussed in more detail below, the business carried out in this District is the business of Defendants.

### ii.  Regular and Established Place of Business

Again, in their actual motion to dismiss, Defendants did not dispute this factor other than to argue that shipment of products to this District did not constitute a "regular and established place of business." (Doc. No. 156, at 12.) This argument misses the mark because again Defendants do more than simply ship products to this District. Indeed, it is undisputed that they continuously sell products from retail stores in this District, including the alleged infringing products that are subject to an injunction of this Court based on sales in this District. Moreover, there is no dispute that Defendants have maintained these relationships for many years on an ongoing and continuous basis. Indeed, as discussed in more detail below, the evidence produced during discovery showed that for the years 2014–2017, Telebrands paid Walgreens sums of cash to lease premium shelf space for its products. (Doc. No. 222-30; Doc. No. 222-5, Deposition of Angelo Bianco "Bianco Dep." at 129:21–130:1; Doc. No. 222-6, Telebrands 30(b)(6) Deposition at 155:22–156:9, 301:10–13; Doc. No. 222-24.) Courts have held that a five-year continuous

presence in the district demonstrates that the business was established for purposes of venue. *See Remington Rand Bus. Serv. v. Acme Card Sys. Co*., 71 F.2d 628, 629 (4th Cir. 1934); *see also In re Cray Inc*., 871 F.3d at 1363. The fact that these relationships have been established and are not ephemeral is further evidenced by the ongoing contracts regarding sales and product placement in this District, which are discussed in more detail below.

### iii.   Place of the Defendant

The main dispute presented by Defendants' Motion is whether there is a place of business of the Defendants in this District. Defendants contend that they do not have a place of business in this District because they do not lease space, they do not have rights to retail space, and they maintain no control over the placement and servicing of their products in retail stores. (Doc. No. 233, at 16.) As discussed above, Plaintiffs maintain that Defendants have a place of business in this District because they lease shelf space in this District and exercise control over product placement in retail stores located throughout this District. (Doc. No. 222, at 13–16.) Specifically, Plaintiffs point out that Telebrands's Vice President of Sales, Angelo Bianco, admitted that Telebrands leased ███████ space for its As Seen on TV shelf space in Walgreens stores. *Id*. at 13, citing Doc. No. 222-5, Bianco Dep. at 251:20–22; 252:6–10. Plaintiffs further argue that Telebrands's Vice President, Arline Wall, admitted that the As Seen on TV space was Telebrands's own space. *Id.* Plaintiffs also argue that Telebrands's venue expert admits that Telebrands exercises control over this space. *Id.* Further, Plaintiffs argue that Telebrands enters into other agreements with retail stores that are analogous to paying rent and leasing space, such as paying retail stores upkeep fees to maintain approximately ████% of prominent As Seen on TV space in stores, employing and paying third-party agents to monitor, restock, clean, and affix pricing stickers to As Seen on TV shelf space, and paying retailers to construct the As Seen on

10

TV space in their stores. *Id.* at 13–14. As to control, Plaintiffs argue that Telebrands controls the placement of its product pallets in this District by: (1) monitoring sales data relating to stores in this District and employing agents to visit stores and see how products are placed; (2) retaining and paying agents to physically move Telebrands's products from the backroom to the sales floor; (3) having its agents report back to Telebrands regarding pallet placement in this District; and (4) conducting these activities because ████████████████████████████████ ████████████████. *Id.* at 15.

The facts of this case establish that venue is proper in this District. In *Cray*, the Federal Circuit emphasized that relevant considerations for whether a place of business is that of the defendant include "whether the defendant owns or leases the place, or exercises other attributes of possession or control over the place." *In re Cray Inc.*, 871 F.3d at 1363. In his deposition, Telebrands's Vice President of Sales, Angelo Bianco, was asked whether Telebrands has paid fees to lease space within Walgreens and Rite Aid, and he testified that "the only space that I recall them leasing was the ██████ space which was addressed earlier today…" (Doc. No. 222-5, Bianco Dep. at 251:20–252:10.) Mr. Bianco explained in his deposition that this "holiday space" was leased from at least the time period of 2014–2016, whereby Telebrands would pay for premium "end cap" spaces during the holidays to increase sales. *Id.* at 69:9–72:4, 129:21 – 130:1; *see also* Doc. No. 224-24 (showing payment amounts for Telebrands's product placement for holiday space at Walgreens, at least some of which are located in this District).[5] Telebrands made the last such agreement in October 2017, after the filing of this action, paying $████ for the display of several of its As Seen on TV products on the holiday cube table. (Doc. No. 224-24, at 2–3; Doc. No. 222-6 Telebrands 30(b)(6) Dep. at 301:10–13.)

---

[5] Mr. Bianco further testified that the estimated amount of space designated to Telebrands by Wal-Mart during this time was anywhere from ██████ percent. *Id.* at 36:18–37:19.

Telebrands argues that Mr. Bianco later clarified during his deposition that Telebrands does not lease space in any retail store. (Doc. No. 233, at 5, citing Bianco Dep. at 258:18–20, 261:8–13, 265:19–22.) Regardless of the semantics of whether Mr. Bianco called the arrangement with Walgreens a "lease", or whether this payment for premium space would be considered a lease in a traditional sense, it establishes a payment made for premium shelf placement at Walgreens whereby Telebrands actively participates by paying money for said placement to increase its profits.

Indeed, perhaps what is most unique about the premium placement of products in this District is Telebrands's As Seen on TV product sections in stores throughout the District. *See, e.g.*, Doc. No. 222-30 (depicting pallets of "As Seen on TV" products at several retail locations in this District). Defendants argue they do not own or lease this space (Doc. No. 233, at 7), but the evidence shows that Defendants hold this space out as their own, pay fees to construct the space in retail stores, and control product placement for these spaces. Notably, during the trial in related case number 6:16-cv-33, Telebrands's Vice President of Procurement, Ms. Arline Wall, testified that the "As Seen on TV logo" in "*our* As Seen on TV section" has a lot to do with how Telebrands brings a product to market because Telebrands advertises so heavily. (Case No. 6:16-cv-33, Doc. No. 553, November 17, 2017 Hearing Transcript at 8:21–9:18 (emphasis added).)[6] Given this testimony, there is no question that Telebrands considers the "As Seen on TV" sections to be its own, markets its products with the "As Seen on TV" logo, and that this logo and these product sections in stores are associated with Telebrands. Indeed, as shown in the photographs of some of these sections located in this District, these "As Seen on TV' sections

---

[6] Ms. Wall later clarified that Telebrands does not own "As Seen on TV" just that Mr. Khubani created it. Tr. at 23:3–6. The fact that the logo is not owned by Telebrands and available for free use does not change the important fact that indeed this logo is closely associated with Telebrands's products and remains a key strategy on how they advertise their products and ultimately bring them to market.

are centrally placed standalone sections in the retail stores. (Doc. No. 222-30.) Similar evidence showed that Telebrands paid Sears $███ to create an "As Seen on TV" section in its retail stores, at least some of which are located within this District. (Doc. No. 222-25, at 5–29; Doc. No. 222-6, Telebrands's 30(b)(6) Dep. at 306:25–308:12.) Further, Telebrands pays agents to monitor, clean, restock, and affix price signage to the As Seen on TV sections within these retail stores.

One such third-party agent of Telebrands is ████████████, an entity located in this District whose work on Telebrands's behalf for "As Seen on TV" sections includes bringing product from the back room to the store front "modular" and printing and placing pricing labels on the products. *See* Doc. No. 222-26; Doc. No. 222-9, 30(b)(6) Deposition of ████████ ████████ (Jan. 26, 2018), at 24:7–23; Doc. No. 222-5, Bianco Dep. at 39:2–6. For example, ████████████ has identified Telebrands's "zero sales" stores where it then facilitates movement of Telebrands's "zero sales" products in those stores, including locations within this District. *See, e.g.,* Doc. No. 222-19. This type of work is what Telebrands contracts with ████████████ to do on its behalf. (Doc. No. 222-6, Telebrands 30(b)(6) Dep. at 112:19–113:11.) Indeed, in this capacity, Telebrands refers to ████████████ as its "eyes and ears" in the retail stores. *Id.* at 186:4–187:15. Another such third-party is ████████ ████, who has moved products from the back room to the store shelves within this District on behalf of Telebrands. (Doc. No. 222-10, 30(b)(6) Deposition of ████████████, at 59:18–60: 21; 87:13–23.) Indeed, at least with respect to Telebrands's Star Shower products, ████████████ has moved products at Telebrands's express direction over concerns that sales had dipped at Wal-Mart stores. *Id.* at 28:1–29:16; 67:17–22. ████████████ similarly has moved Telebrands's Red Copper products to "As Seen on TV" end caps in at least one retail

store in this District. *Id.* at 56:5–57:9. Notably, even ████████████ characterizes product placement on the modular setup as Telebrands's ownership percentage of the modular. *See* Doc. No. 222-22 ("[t]he invoice breaks out your ownership percentage of the modular."). These actions constitute ownership and control over product placement in this District via Telebrands's initiated action carried out by a hired third-party agent. Defendants argue that the relationship with these third parties is dictated by Wal-Mart (Doc. No. 233, at 8), but it is Telebrands who maintains contractual agreements with these parties and also pays them to carry out this work. *See* Doc. No. 222-11 (contract and invoices from ████████████); Doc. No. 222-14 (invoices from ████████████ for contractual payments).

Telebrands also employs an entity called ████████ to manage its merchandising services such as ████████████. (Doc. No. 222-7, ████████ 30(b)(6) Deposition at 30:22–31:1.) ████████ helps these merchandisers to communicate with Telebrands on the needs and status of retail stores. *Id.* at 31:2–22. Telebrands relies on ████████ to help procure the best available space in the retail stores. (Doc. No. 222-5, Bianco Dep. at 72:5–19.) Indeed, Telebrands itself monitors retail sales on a weekly basis and works with these service providers to investigate the situation for product placement so that it can increase profits from sales of those products. (Doc. No. 222-6, Telebrands 30(b)(6) Dep. at 29:17–22, 65:15–20; Doc. No. 222-5, Bianco Dep. at 64:3–65:2.) These sales are of importance to Telebrands because in some instances, such as in Wal-Mart stores, Telebrands is ████████████████████ ████████████████████████████████████████. (Doc. No. 222-6, Telebrands 30(b)(6) Dep. at 87:14–89:19.)

While Telebrands maintains it has no control over retail product placement in this District (Doc. No. 233, at 9), perhaps most telling of Telebrands's control over its retail product

placement in this District is what occurred at the outset of this very action. At the outset of this case, Plaintiffs moved for a TRO in part on the basis that the accused balloon products contained unsafe levels of phthalates. (Doc. No. 5.) In response, at the hearing, ███████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████. (Doc. No. 43, Hearing Tr. at 33:22–34:4.) Telebrands's ability to enforce an immediate temporary removal of its products from retail stores is significant. This action demonstrates Telebrands's ability to control product sales and placement in this District.

In sum, the totality of the circumstances, including Telebrands's As Seen on TV sections that are maintained and advertised by Telebrands in this District, as well as Telebrands's ability to monitor and control retail product placement suggests Telebrands has a place of business in this District. Indeed, Telebrands has repeatedly paid for "As Seen on TV" space from at least some of these retailers, monitors and manages product placement with respect to other retailers, and effectuates the pallets of its own "As Seen on TV" sections within these retail stores. While Telebrands contends that the final decision of product placement is always up to the retailer, Telebrands's ability to control the movement of its products from the back room and the removal of products from shelves undermines this position and the contention that Telebrands has no final say in what happens to its products in retail stores in this District.

Lastly, Telebrands urges that venue is not proper because the business it conducts in this District is not unique to this District, and is the same as it conducts business in other districts. (Doc. No. 233, at 7–8). While this can be an appropriate consideration for whether venue is proper in this District, the question is not whether Telebrands targets this District, as indeed that question is jurisdictional in nature. The question simply is whether Telebrands conducts its

business in such a way in this District that venue is proper. Although the actions discussed herein taken by Telebrands in this District may not be unique compared to other districts, that does not in and of itself make venue improper where the showing has been made that Telebrands's actions in this District have created a regular and established place of business in this District.

### b.  Forfeiture of Venue Defense

Recently, the Federal Circuit also considered the issue of when an improper venue defense may be forfeited. *In re Micron Technology, Inc.*, 875 F.3d 1091 (Fed. Cir. 2017). In *Micron*, the Federal Circuit determined that *TC Heartland* was an intervening change in law, but noted that that "apart from Rule 12(g)(2) and (h)(1)(A), district courts have authority to find forfeiture of a venue objection."  *Id.* at 1099–1101.  However, the Federal Circuit did not "explore the contours of timeliness outside Rule 12(g)(2) and (h)(1)(A) or how to assess what constitutes consent to venue or what if any other considerations could justify a finding of forfeiture even when the defendant has not waived its objections under Rule 12(g)(2) and (h)(1)(A)." *Id.* at 1102.

Other courts have considered the factual circumstances presented outside the contours of the Federal Rules and found waiver of a venue defense based on conduct. *See, e.g., Koninklijke Philips v. ASUSTeK Computer Inc.*, No. 1:15-cv-1125, 2017 WL 3055517, at *8 (D. Del. July 19, 2017) (finding defendants' conduct waived any venue defense where defendants participated in a scheduling conference, conducted discovery, and attended a *Markman* hearing"); *Infogation Corp. v. HTC Corp.*, No. 16-CV-01902, 2017 WL 2869717, at *3 (S.D. Cal. July 5, 2017) (finding defendants waived any challenge to venue through litigation conduct by participating in litigation for "approximately a year, including by serving invalidity contentions, filing two motions to stay, filing a motion for judgment on the pleadings, and participating in claim

construction."). The Federal Circuit itself has also denied mandamus in "several cases involving venue objections based on *TC Heartland* that were presented close to trial." *In re Micron*, 875 F.3d at 1101 (citing *In re Nintendo of Am. Inc.*, No. 2017-127, 2017 WL 4581670, at *1 (Fed. Cir. July 26, 2017); *In re Techtronic Indus. N. Am., Inc.*, No. 17-125, 2017 WL 4685333, at *1 (Fed. Cir. July 25, 2017); *In re Hughes Network Sys., LLC*, No. 17-130, 2017 WL 3167522, at *1 (Fed. Cir. July 24, 2017); *In re Sea Ray Boats, Inc.*, 695 F. App'x 543, 543–44 (Fed. Cir. 2017)).

Here, Defendants contend that they timely raised their venue defense because they brought a preemptive motion to dismiss prior to *TC Heartland* as well as two motions following the Supreme Court's decision in *TC Heartland*. (Doc. No. 156, at 9.) Plaintiffs argue that Defendants' conduct in related proceedings as well as their conduct in this proceeding constitutes a forfeiture of their venue defense. (Doc. No. 163, at 13–14.)

This case indeed presents a unique set of circumstances that have led to this juncture. As discussed, the first dispute between these parties was filed in June 2015, and since that time, this Court has held numerous injunction proceedings, issued four injunctions, and completed trial on two of the patents-in-suit for closely related products. Indeed, this particular action was only brought by Plaintiffs due to Defendants' refusal to produce discovery and join these products in the 6:16-cv-33 case, which has now been fully tried. This case was brought as a result of Defendants' third product design around, which caused Plaintiffs to bring the instant action and immediately file for a temporary restraining order and preliminary injunction. (Doc. Nos. 1, 5.) Those motions ultimately resulted in multiple hearings and the granting of a preliminary injunction in this matter. (Doc. Nos. 89, 122.) Throughout these initial injunctive proceedings in this case, Defendants did not affirmatively raise a venue defense and instead only stated in a footnote that their participation did not concede venue. (Doc. No. 22.)  Defendants' Motion to

Dismiss was ultimately brought one week after the Court had granted an injunction in this matter. (Doc. No. 90.)

Moreover, as discussed above, the injunction in this matter was really a continuation of three prior injunctions previously issued by the Court. Thus, the continuation of cases in this Court arose not only from Defendants' conduct in litigation, but Defendants' business choices made in reaction to orders of this Court. This repeated behavior occupied the Court and parties' resources for nearly three years. As of November 2017, this Court completed a jury trial on two of the patents-in-suit on a prior injunction and related products without a meritorious venue objection prior to trial. Similarly, Defendants did not raise a venue defense in related matter 6:15-cv-551 until that case had been stayed and on appeal with the Federal Circuit. These motions were therefore denied and not further challenged by Defendants.

While this Court has not yet set a schedule in this matter because the Court first resolved the injunction and then stayed the matter to decide the issue of whether venue was proper, the Court expects that an expedited trial schedule can now be set in this matter. Indeed, the substantial majority of discovery regarding the products at issue has been exchanged by the parties in the 6:16-cv-33 case, as well as in the early injunction proceedings in this matter. The Court expects claim construction, if any, to be brief. Thus, the Court anticipates receiving input from the parties regarding an expedited schedule to trial upon the final resolution of this Motion.

As discussed above, the Court finds that Defendants properly reside in this district for purposes of venue under §1400(b). However, even if Defendants do not reside in this District, given the totality of these circumstances, the Court finds that Defendants have forfeited a venue defense. Therefore, the Court **RECOMMENDS** that Defendants' Motion to dismiss for improper venue (Doc. No. 156) be **DENIED** as to the claims for patent infringement.

18

## II.    Lanham Act Claims

In their amended complaint, Plaintiffs also assert claims for violations of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). (Doc. No. 74, at 18–19.) These claims are based on Plaintiffs' allegations that Defendants' falsely advertised their Easy Einstein Balloons as having "anti-leak technology" and as being appropriate for children "Ages 8+". *Id.* Defendants move to dismiss these allegations for failure to state a claim upon which relief can be granted. (Doc. No. 156, at 13–34.)

Section 43(a) of the Lanham Act, codified at 15 U.S.C. § 1125, provides in relevant part:

Any person who ... in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

§1125(a)(1)(B) (2012).

The Fifth Circuit has held that the elements for a false advertising claim under the Lanham Act are: (1) a false or misleading statement of fact about a product; (2) such statement either deceived, or had the capacity to deceive a substantial segment of potential consumers; (3) the deception is material, in that it is likely to influence the consumer's purchasing decision; (4) the product is in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the statement at issue. *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495 (5th Cir. 2000).

As to the allegations that Defendants' statements on the anti-leak technology are false because the balloons leak, Defendants contend that the basis for those allegations is stripped down testimony from their expert Dr. Kamrin, creating only an illusion of falsity. (Doc. No. 156, at 15.) Defendants further contend that Plaintiffs misleadingly cut and paste from Defendants' website an embedded video. *Id.* As a result, Defendants argue that their leak-related statements

are not literally false and even if taken literally constitute non-actionable puffery. *Id.* at 21–24. Defendants further argue that Plaintiffs have failed to allege these anti-leak statements are misleading or that deception is material. *Id.* at 25–28. Plaintiffs argue that their allegations are sufficient and that Defendants' arguments go to the merits, which is improper for a motion to dismiss. (Doc. No. 163, at 26.)

Defendants' allegations regarding the context and veracity of Plaintiffs' characterization of its expert's testimony and the material on Defendants' website goes to matters outside of the pleadings and ultimately whether the allegations themselves are true. Of course the relevant inquiry for a motion pursuant to 12(b)(6) is whether the allegations, taken as true, state a claim for relief. *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) ("[t]he ultimate question in a Rule 12(b)(6) motion is whether the complaint states a valid claim when all well–pleaded facts are assumed true and are viewed in the light most favorable to the plaintiff."). Thus, Defendants' proffered factual disputes regarding the veracity of the statements in Plaintiffs' complaint are irrelevant to the motion and ultimately not persuasive. The Court declines to engage in resolving the factual basis and truth of the allegations on a motion to dismiss pursuant to 12(b)(6).

Here, Plaintiffs have alleged that Defendants made false statements about their Easy Einstein products that the seal is "super tight, keeping the water inside" and that "not a single drop" leaks, when in fact the products leak. (Doc. No. 74, at ¶¶ 112, 113.) Thus, Plaintiffs have alleged that Defendants made a false or misleading statement about their own product. Further, Plaintiffs allege that consumers relied on these statements in purchasing Defendants' products, but later discovered that Defendants' balloon products leaked. *Id.* at ¶ 116. Plaintiffs further allege that the statements were material to the consumers' choice to purchase the products and

that they would not have purchased those products had they known the products leaked. *Id.* Plaintiffs also alleged that the products are being sold in interstate commerce and that Plaintiffs have been damaged by the sale of these products based on false statements because "a substantial segment of consumers—relying on Defendants' false claims about supposed 'anti-leak technology' and an 'anti-leak seal'—have purchased Defendants' Easy Einstein Balloons product instead of purchasing plaintiffs' Bunch O Balloons product." *Id.* at ¶¶ 115, 128. Thus, as to the allegations based on Defendants' anti-leak statements, Plaintiffs have sufficiently alleged facts to state a claim for relief for false advertising under the Lanham Act. *Pizza Hut,* 227 F.3d at 495. Accordingly, the Court **RECOMMENDS** that Defendants' Motion (Doc. No. 156) be **DENIED** as to these allegations.

As to Plaintiffs' allegations regarding the age appropriateness of Defendants' Easy Einstein Balloons, Defendants argue that Plaintiffs have no private right of action under the Consumer Product Safety Improvement Act ("CPSIA") for these allegations. (Doc. No. 156, at 29.) Defendants further argue that these statements are not literally false because they are not unambiguous, and that Plaintiffs have failed to allege that "Ages 8+" misled consumers or that deception was material. *Id.* at 31–35. Plaintiffs argue that they are not using the CPSIA to shoehorn a claim under the Lanham Act, but rather citing the CPSIA to support their contention that Defendants' statements are literally false. (Doc. No. 163, at 30.)

As an initial matter, the Court agrees with Plaintiffs that the allegations regarding age appropriateness do not rely on the CPSIA to create a false advertising claim, but rather cite the CPSIA as a factual basis for the falsity of the alleged statement. For example, in their allegations, Plaintiffs identify the false statement on Defendants' packaging as "Ages 8+". (Doc. No. 74, at ¶ 118.) To plead falsity of that statement, Plaintiffs allege that Defendants' products contained "as

much as 16% DEHP, a number that is 160 times over the 0.1% legal limit," and that regardless of the laws or the rules the Consumer Product Safety Commission (CPSC), "substantial medical literature shows that products containing phthalates are unsafe for children." *Id.* at ¶¶ 119–21. Thus, Plaintiffs' allegations merely rely on the legal limit as a factual basis to support their contention that "Ages 8+" is a false statement. Further, Plaintiffs cite to literature as an alternative basis to support falsity.

Defendants' next argument that Plaintiffs' pleadings are insufficient is that the statement "Ages 8+" does not sufficiently allege falsity because it is unambiguous. However, the Court will not make a determination as to whether the statement is "unambiguous" at the pleading stage. Again, the question is simply whether the Plaintiffs have alleged a false statement was made, and assuming that statement is true, whether it states a claim for relief. *Lone Star Fund V,* 594 F.3d at 387.

Here, Plaintiffs have alleged that Defendants' statement "Ages 8+" is a literally false statement, and that the statement "has deceived or has the capacity to deceive a substantial segment of potential consumers" because it has caused consumers to believe that the product does not contain unsafe levels of harmful chemicals. (Doc. No. 74, at 122–24.) Further, Plaintiffs allege the products are sold in interstate commerce, that parents routinely rely on these statements to inform them on the safety of a product for their children when purchasing such a product, and that Plaintiffs believe that parents relied on this statement in purchasing Defendants' balloon products and were misled by it. *Id.* at ¶¶ 125, 126, 128.  Finally, Plaintiffs allege that they have been harmed because the misled consumers "would have purchased plaintiffs' Bunch O Balloons product" instead had they known Defendants' products contained unsafe levels of phthalates. *Id.* at ¶ 127. Thus, as to the allegations based on Defendants' age

appropriateness statements, Plaintiffs have sufficiently alleged facts to state a claim for relief for false advertising under the Lanham Act. *Pizza Hut,* 227 F.3d at 495. Accordingly, the Court **RECOMMENDS** that Defendants' Motion (Doc. No. 156) be **DENIED** as to these allegations.

## CONCLUSION

For the reasons set forth herein, the Court **RECOMMENDS** that Defendants' Motion to Dismiss (Doc. No. 156) be **DENIED**. Plaintiffs' Motion to Strike (Doc. No. 220) and Defendants' Motion to Strike (Doc. No. 231) are **DENIED** as **MOOT**. Within **seven (7) days** of the issuance of this Order, the parties shall file a notice with the Court as to whether this Order can be unsealed, or request appropriate redaction.

Within fourteen (14) days after receipt of the Magistrate Judge's Report, any party may serve and file written objections to the findings and recommendations contained in the Report. A party's failure to file written objections to the findings, conclusions and recommendations contained in this Report within fourteen (14) days after being served with a copy shall bar that party from *de novo* review by the district judge of those findings, conclusions and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court. *Douglass v. United States Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996)**.**

**So ORDERED and SIGNED this 9th day of March, 2018.**

JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE